UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

RODNEY D. ELLIS,                                    |        Case No. 1:07-cv-910
                                                    |
        Plaintiff,                                  |        HONORABLE PAUL MALONEY
                                                    |
            v.                                      |
                                                    |
MARILYN A. KAYE-KIBBEY,                             |
                                                    |
        Defendant.                                  |
                                                    |

---

**Opinion and Order**

**Granting in Part and Denying in Part the Defendant's Motion for Summary Judgment:**

**Permitting Plaintiff to Proceed as to Defendant's October 2003 - April 13, 2004 Communications;
Permitting Plaintiff to Proceed as to Defendant's April 7, 2004 Affidavit**

**Dismissing Claim as to Documents Produced by Defendant in Response to Enslen 2004 Subpoena;
Dismissing Claim as to Testimony by Defendant at April 2007 NASD Hearing;**

Plaintiff Rodney D. Ellis ("Ellis") claims that defendant Marilyn A. Kaye-Kibbey ("Kaye") violated a written release agreement ("the agreement") by making disparaging statements about Ellis and his corporation. It is undisputed that Kaye did the following after the execution of that agreement: filed an affidavit and testified on behalf of Ellis's adversary in a National Association of Securities Dealers ("NASD") arbitration proceeding. Kaye moves to dismiss the second amended complaint on two independent grounds. First, Kaye contends that the original non-disparagement agreement was no longer in effect when she made any of her arguably disparaging communications

-1-

about Ellis. Kaye alleges that later on the same day that the parties executed the agreement, she exercised her explicit contractual right to revoke that agreement. She further alleges that the next day, the parties signed a new release agreement (a one-page handwritten document) that expressly revoked and superseded all previous release agreements. Second, Kaye contends that even if the original release agreement was not revoked, as a matter of law she "cannot be liable for breach of a non-disparagement agreement relating to statements she made as a third-party witness in another lawsuit."

For the reasons that follow, the court will grant in part and deny in part the defendant's motion to dismiss the second amended complaint or for summary judgment.

First, Ellis has shown a genuine dispute as to two material facts: (1) whether Kaye actually gave her purported August 27, 2003 revocation letter to Ellis or his attorney, *see* Kaye Aff. Ex. A, or whether that letter was a "back-dated fabrication" as Ellis alleges; and (2) whether the parties actually executed the August 28, 2003 agreement that purported to supersede the original release agreement they had executed the previous day, or whether that document was a fake containing Ellis's forged signature.

On the current record, a reasonable jury could find that Kaye never exercised her contractual right to revoke the August 27 agreement – i.e., that she did not hand-deliver the revocation letter to Ellis or fax it to Ellis's attorney – and that the parties never entered into the purported August 28 superseding agreement. If the jury made those two findings, it could then find that the original agreement's non-disparagement provision was still in effect when Kaye communicated orally to Lincoln pre-litigation, produced documents to Lincoln pursuant to a federal-court subpoena during litigation, signed an affidavit critical of Ellis that Lincoln filed in federal court, and testified

adversely to Ellis before an NASD arbitration panel.  A reasonable jury could certainly find that Kaye's communications were "negative", "critical", or "disparag[ing]" remarks of the type prohibited by the August 27 release.

Second, as a matter of law, the court holds that if Kaye was subject to, and violated, the non-disparagement provision in the August 27, 2003 agreement, the Michigan common law accords absolute quasi-judicial immunity to some – but not all – of her communications.

The court breaks Kaye's arguably-disparaging communications into four categories:

1.  Not Privileged.  Communications that Kaye made before Lincoln and Ellis were in litigation or arbitration, from October 2003 into April 2004.  Such communications could not have been made to comply with any subpoena, as neither federal nor state court had yet issued any subpoenas, so quasi-judicial immunity does not protect Kaye.

2.  Covered by Privilege.  Documents that Kaye produced that were covered by U.S. District Judge Enslen's April 2004 subpoena in Lincoln's federal lawsuit against Ellis.  The court holds that, as a matter of law, this second set of communications may not lead to the imposition of breach-of-contract liability on Kaye, because of Michigan's paramount and well-established public policy favoring obedience to valid subpoenas and freedom to participate with absolute immunity in judicial proceedings without fear of retaliation or adverse consequence.

3.  Not Privileged.  The affidavit that Kaye signed on April 7, 2004 at Lincoln's behest. Such communications could not have been made to comply with any subpoena or order, as neither federal nor state court had yet issued any subpoenas or orders, so

quasi-judicial immunity does not protect Kaye.

4.  Privileged.  Kaye's live testimony at the April 2007 hearing before the panel in the
Lincoln-Ellis NASD arbitration proceeding, which she was commanded to give by
a Michigan state court's November 2006 subpoena ad testificandum.  Ellis contends
that the subpoena itself was not directly enforceable in Florida, where Kaye then
resided, but the parties agree that Kaye could have been compelled to give the same
testimony by deposition in Florida.

# BACKGROUND

Beginning in 1975, Kaye worked for Ellis at Ellis's insurance agency.  Kaye's Motion to
Dismiss the Second Amended Complaint ("MTD"), Ex. 1, Affidavit of Marilyn A. Kaye-Kibbey
dated December 5, 2007 ("Kaye Aff.") ¶ 2.  For most of that time, Ellis's company was an agent of
Lincoln.  *See* MTD at 1-2 (citing no source).  In 2001, Ellis, while still a Lincoln agent, formed a
brokerage/insurance agency called Summit Managed Investments, LLC ("Summit"), asked Kaye
to manage the company, gave Kaye the funds needed to operate the company, and made Kaye the
nominal owner even though Ellis allegedly "retained control" of Summit.  *See* Kaye Aff. ¶¶ 3-4.

By August 2003, Kaye had come to believe that Ellis, while still working for his company
and serving as a Lincoln agent, was using Summit to transfer business from Lincoln to Raymond
James Financial Services ("Raymond James"), which Kaye believed was a violation of his duties
to Lincoln.  Kaye's MTD at 2 (citing no source).  Kaye further alleges that Ellis asked her several
times to act in an inappropriate manner, and that their relationship therefore deteriorated.  *Id.*
According to Kaye, the parties "went back and forth on the terms of their separation, issuing and

-4-

revoking multiple agreements."  Kaye's MTD at 2 (citing Kaye Aff. ¶ 6).  Under Kaye's version of

events,

> On August 27, 2003, Mr. Ellis and I executed the Release Agreement which is attached to Mr. Ellis's complaint.

> On August 27, 2003, after I executed the Release Agreement, I hand delivered an original and a copy of a letter to Mr. Ellis revoking the Release Agreement I had executed earlier. * * *  I also faxed a copy of the letter to Mr. Ellis's attorney[1] . . . .

> On August 28, 3003, and because the Release Agreement had been revoked, Mr. Ellis and I executed another agreement concerning the separation of our business interests.  * * *

Kaye Aff. ¶¶ 7-9.

> The release agreement dated August 27, 2003, provides, in pertinent part,

> **Comments.**  Neither Marilyn [defendant Kaye] nor Summit will initiate or join in negative or critical comments, discussions or other discussions about, or otherwise disparage Rod or Lucasse [Ellis, LLC], their affiliates, or their services, employees, clients, agents, attorneys, accountants, banks, or any other person or entity associated with Rod [plaintiff Ellis] or Lucasse.  Neither Rod nor Lucasse will initiate or join in negative or critical comments, discussions or other communications about, or otherwise disparage Marilyn or Summit, their affiliates, or their services, employees, clients, agents, attorneys, accountants, banks, or any other person or entity associated with Marilyn or Summit.

> * * *

> Marilyn reserves the right to revoke this Agreement for a period of (7) days following the date of execution.  This agreement shall not become effective or enforceable until this revocation period has expired.

Declaration of Rodney Ellis dated ("Ellis Dec"), Ex. 1.  Kaye alleges that she exercised her

---

[1]

The record contains a facsimile transmittal sheet ("Fax cover sheet") that is dated "~~8-21-03~~ 8-27-03."  The fax cover sheet bears the name "Tim Hillegonds" (Ellis's attorney) in the "To:" field, bears the name "Marilyn Kaye" in the "From:" field, and bears the handwritten note "Revoke agreement dated ~~8/15/03~~ 8/27/03 by Marilyn Kaye."  Kaye Aff., Ex. A.

But the record does not contain any post-fax sheet confirming that the fax was actually sent to the number listed on the cover sheet ("752-2500" with no area code).

contractual right to revoke the August 27 release agreement before it took effect:

> It never became enforceable, because, later that day, and well within the seven-day revocation period, Kibbey revoked the agreement in a handwritten note, which she signed and sent to both Ellis and his counsel, Timothy Hillegonds at Warner, Norcross and Judd LLP.  * * *  Thus, there is no genuine issue of material fact as to whether the non-disparagement agreement upon which Ellis's claims are based is enforceable; it is not.

Kaye's MTD at 4-5.

The purported superseding release agreement, dated August 28, 2003, consists of one handwritten page bearing what appears to be the signatures of Ellis and Kaye.  (There are no typewritten names below the signatures to confirm the signatories' identity.)  *See* Kaye Aff., Ex. B. The August 28, 2003 purported release agreement states, in its entirety:

> Marilyn [Kaye-Kibbey] & Rod [Ellis] agree that all previous signed agreements are void & this is the final agreement to settle Marilyn leaving Raymond James & Summit Managed Investments.

> Rod wants all RJ/Summit files.  He has all on scanned disk, so Marilyn will give him personal files for him & L-E [?].  RJ may want the files.

> Marilyn keeps the approx 88k - 103k she has in RJ/Summit ck. [checking?]  ~~files~~ accounts.

> Lucasse, Ellis [Ellis's company] forgives the loan of approx. 13k.  But Rod will give Marilyn [an IRS Form] 1099 for it.

> Rod will take care of loan for Embassy [?] Dr. for RJ/Summit Office & pay all acct. fees & atty. fees to close office.

> Rod & Marilyn agreed about the furniture, each keeps their own.

> Marilyn discharge [?] atty.

> Rod Ellis will NOT hold Marilyn liable on anything now or in future.

> [two handwritten signatures with the dates 8/28/03]

> – My Copy

– Rod has org. [original?]

Kaye Aff., Ex. B (Aug. 28, 2003 alleged second release agreement).

Ellis focuses on the original, August 27, 2003, release agreement signed by the parties ("the original agreement"), which he contends is still in effect.[2]   At the time of the agreement, Kaye knew that Ellis and his company were agents for the Lincoln National Life Insurance Company and Lincoln Financial Advisors Corporation (collectively "Lincoln").  *See* 2nd Am. Comp. ¶ 9.[3]

Paragraph 3c of the original agreement obligated Kaye to refrain from making or joining in any "negative or critical comments, discussions, or other communications about Ellis or" Ellis's company, "or otherwise disparag[ing] Ellis" or his company.  *See* 2nd Am. Comp. ¶ 10.  Ellis alleges that Kaye violated the original agreement's non-disparagement provision in several ways:  in

---

[2]

The other signatories to the agreement were Lucasse Ellis, Inc. (a Michigan corporation then owned by Ellis, hereinafter "Ellis's company") and Summit Managed Investments, LLC (a Michigan corporation then owned by Kaye, hereinafter "Kaye's company").  *See* 2nd Am. Comp. ¶¶ 6-7 and Ex. 1 (Aug. 23, 2003 Release Agreement).  The two corporate signatories are not parties to this lawsuit and have not sought to intervene.

[3]

When sitting in diversity jurisdiction, this court must apply the choice-of-law rules and, if applicable, the substantive law of the forum State, Michigan.  *CenTra, Inc. v. Estrin*, – F.3d –, –, 2008 WL 3540081, *5 (6th Cir. Aug. 15, 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)); *see also Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

When interpreting contracts in a diversity action, the federal courts also "generally enforce the parties' contractual choice of governing law."  *Savedoff*, 524 F.3d at 762 (citing *Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 596 (1991) and *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).  Because the parties negotiated the agreement(s) in Michigan, s*ee* 2nd Am. Comp. ¶ 8, Kaye made all the arguably-disparaging communications in Michigan, and the parties agree that Michigan law governs this dispute,  the court applies Michigan substantive law.  *See Savedoff*, 524 f.3d at 762 ("As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute.").

October 2003, by calling Lincoln's compliance department and making disparaging statements about Ellis; "in the following months," by meeting and communicating with Lincoln's attorneys and giving them documents that she claimed provided evidence of wrongdoing by Ellis; and on April 7, 2004, by signing an affidavit prepared by Lincoln's lawyers.  *See* 2nd Am. Comp. ¶¶ 10, 12-13.[4]

Specifically, Ellis alleges that on October 6, 2003, Kaye telephoned Lincoln's compliance department to make disparaging statements about Ellis.  *See* Ellis Opp at 6 (citing Fossi Dec ¶ 11 & Ex 8 at 2169)  Over the next five months, Ellis claims, Kaye had a number of conversations with, and corresponded with, Lincoln personnel.  *See* Ellis Opp at 6, citing Fossi Dec ¶ 13 & Ex 10 (Oct. 6, 2003 letter from Lincoln's Patricia Daly to Kaye), Fossi Dec ¶ 18 & Ex 15 at 0058 ("[Lincoln's] J. Caulfield interviewed M. Kaye w/in last 6 mos."), Ex 15 at 0060 ("Rod [Ellis] owes Marilyn [Kaye] $ in her view.  She's mad."), Ex 15 at 0064 ("TRS to follow up w/ Marilyn Kay [sic]"), Ex 15 at 0066 (Nov. 12, 2003 letter from Lincoln Chief Counsel James Caulfield to Kaye), and Ex 15 at 0068 ("TC [telephone call?] w/ M. Kaye 3.5.04").

---

[4]

Ellis further alleges that Kaye's disparaging statements – suggesting that Ellis had committed fraud or violated National Association of Securities Dealers ("NASD") rules – were materially false.  *See* 2nd Am. Comp. ¶ 11.  Ellis has not asserted a defamation or similar claim, however, merely a claim for breach of the non-disparagement provision, which applied without regard to the accuracy or truthfulness of the disparaging statements.  Accordingly, the court determines that the propriety of summary judgment is not affected by whether Kaye's negative statements about Ellis were true or accurate.  Nor is the propriety of summary judgment affected by whether Kaye *knew, believed, or should have known* that her statements were not true and accurate.

Ellis also alleges that Kaye knew that Lincoln intended to use her affidavit in a federal lawsuit that it planned to file (and indeed did file) against Ellis.  *See* 2nd Am. Comp. ¶¶ 14-15.  Ellis explains that with the use of Kaye's affidavit, Lincoln was able to prevail in two NASD arbitration proceedings, causing Ellis to lose his brokerage license in all the states in which he had been licensed.  *See* 2nd Am. Comp. ¶¶ 15-20.  But the court determines that the propriety of summary judgment on the breach-of-contract claim is not affected by whether Kaye knew that Lincoln would use her affidavit in litigation or arbitration against Ellis.

Ellis further alleges that on March 22, 2004, Lincoln in-house counsel Russell Strunk, Esq., flew to Florida to meet with Kaye; at the meeting, Kaye gave Strunk nine compact discs containing documents allegedly providing proof of Ellis's misconduct. *See* Ellis Opp at 6, citing Fossi Dec ¶ 11 & Ex 8 at 2171-77 and Fossi Dec ¶ 12 & Ex 9.

Next, Ellis claims, Kaye met with Lincoln's lawyers in Alabama in early April 2004, signing an affidavit containing disparaging statements about Ellis. *See* Ellis Opp at 6, citing Fossi Dec ¶ 15 & Ex 12, Attachment A.

Allegedly relying in part on Kaye's affidavit, Lincoln filed a complaint against Ellis and his company in the United States District Court for the Western District of Michigan on April 13, 2004, claiming that Ellis had committed fraud, breach of fiduciary duty, conversion, breach of contract, and tortious interference with contract, and tortious interference with prospective economic advantage, including "selling away", which Ellis characterizes as "a serious violation of an NASD rule." *See* 2nd Am. Comp. ¶¶ 15 and 19-20; Kaye's MTD at 2.; Fossi Dec ¶ 14 & Ex 11. The case was captioned *The Lincoln Nat'l Life Ins. Co. & Lincoln Fin. Advisors Corp. v. Rodney D. Ellis & Lucasse Ellis, Inc.*, designated case number 1:2004-cv-251, and assigned to United States District Judge Richard Alan Enslen ("*Lincoln v. Ellis*").

The parties agree that in late April 2004, Lincoln served Kaye with a subpoena for documents and information in connection with the federal *Lincoln v. Ellis* action. Kaye Aff. ¶ 12 and Ex. D (April 2004 federal subpoena). The subpoena, which was issued by United States District Judge Richard Alan Enslen on April 28, 2004, directed Kaye to

produce the following items for inspection and copying:

1. All documents pertaining to Lincoln National Life Insurance Company, Lincoln Financial Advisors Corporation, or any other affiliate of Lincoln

National Corporation (collectively, hereinafter "Lincoln");

2.      All documents relating to any present or former Lincoln customer;

3.      All documents relating to Summit Managed Investments, LLC;

4.      All documents relating to Rodney Ellis;

5.      All documents relating to H. Scott Dalley;

6.      All documents relating to Luke Terry;

7.      All documents relating to any employee or former employee of Henry Ford Health System who has or had annuity with Lincoln . . . ;

8.      All documents relating to Lucasse, Ellis, Inc.;

9.      All documents relating to the transfer of Lincoln customers to Raymond James;

10.      All documents relating to the assignment of accounts previously serviced by Marilyn Kaye-Kibbey to Luke Terry;

11.      All documents relating to the potential or prospective affiliation of Rodney Ellis, Luke Terry, or Marilyn Kaye-Kibbey with Raymond James.

12.      All of the following, to the extent that they may contain information relating to the foregoing topics: servers; hard drives . . . .

Kaye Aff., Ex. D (*Subpoena Duces Tecum* issued by W.D. Mich. on Apr. 28, 2004 in Case No. 1:04-cv-251-RAE).

Because Lincoln and Ellis had agreed to arbitrate disputes, the federal court lawsuit was stayed while Lincoln's claims were submitted to NASD dispute-resolution arbitration, which Ellis initiated on March 10, 2006; the proceeding was assigned NASD Arbitration No. 06-01227. *See* 2nd Am. Comp. ¶¶ 16-17; Fossi Dec ¶ 3. In turn, Lincoln initiated a second NASD dispute-resolution arbitration proceeding against Ellis "several weeks" after the first one began. *See* 2nd Am. Comp.

-10-

¶ 18; Fossi Dec ¶¶ 3-4 and Ex 1.[5]  The NASD consolidated the two into a single arbitration, NASD Case No. 06-02347.  *See* 2nd Am. Comp. ¶ 21; Kaye's MTD at 2-3.  According to Ellis, the only support Lincoln produced in support of its claims before the NASD was Kaye's affidavit.  *See* Ellis Opp at 9, citing Fossi Dec ¶ 4 and Ex 1, Attachment A.

Ellis, noting that he had not had an opportunity to question Kaye about her disparaging affidavit, asked the arbitration panel to order Lincoln to present Kaye for cross-examination, either by submitting to a deposition or by testifying at the arbitration hearing.  Lincoln opposed the request. *See* 2nd Am. Comp. ¶¶ 22-23.  In response to Ellis's request, the arbitration panel ruled that Lincoln could use Kaye's affidavit only if it made her available to testify at the hearing or a deposition.[6]  *See*

---

[5]

Ellis complains, "Lincoln could simply have asserted its supposed claims against Ellis as counterclaims in the NASD proceeding brought by Ellis, but chose instead to file a separate proceeding."  *See* 2nd Am. Comp. ¶ 18.  Part of this statement is a legal contention (that Lincoln could have asserted its claims as counterclaims in Ellis's arbitration proceeding), rather than a factual allegation.  In any event, the statement's legal contention and its factual allegation are both immaterial to summary judgment on Ellis's breach-of-contract claim.

[6]

Ellis asserts,

The notion that Kaye-Kibbey, who lives in Florida, was required as a third-party witness to comply with any subpoena issued by a Michigan court, whether to produce documents or testify, is simply false.  *See, e.g., People v. Nieto*, 190 N.W.2d 579, 581 n.7 (Mich. App. 1971) (a Michigan subpoena has no effect beyond its borders) [citing *Ann Arbor Bank v. Weber*, 61 N.W.2d 84, 86 (Mich. 1953) ("There is nothing in Rule 32 that suggests that the court is to be considered as expressly or impliedly authorized to issue process enforcible [sic] outside Michigan.")].

Lincoln itself acknowledged as much, when Ellis asked the arbitral panel to allow Ellis either to depose Kaye-Kibbey in the NASD Proceeding or to order Lincoln to produce her at the hearing.  *See* Fossi Decl., ¶ 5 & Ex. 2.  In opposing Ellis's request, Lincoln argued vehemently that "Lincoln does not control Kaye and cannot control whether or not she will appear at the hearing in this matter any more than Ellis can" and that "Ellis has not articulated the legal authority for a NASD panel in Michigan to subpoena a lay witness in Florida (where Kaye is believed to reside) for

2nd Am. Comp. ¶ 24. The panel held evidentiary hearings in November 2006 and April 2007, both in Troy, Michigan. *See* 2nd Am. Comp. ¶ 26. According to Ellis, Lincoln did not offer to make Kaye available for deposition, but it did attempt to force her to testify at the November 2006 hearing. *See* 2nd Am. Comp. ¶¶ 25 and 27.

According to Ellis, Kaye traveled to Michigan the day before the arbitration panel's November 16, 2006 hearing in Troy, Michigan, intending to testify at the hearing. When Kaye arrived in Michigan, Lincoln served on her a subpoena issued through the Circuit Court of Oakland County, Michigan, commanding her to testify at the next day's hearing. *See* 2nd Am. Comp. ¶¶ 27

---

deposition." *Id.* at ¶ 6 & Ex. 3, p.3.

*The Chairman of the Panel apparently agreed with Lincoln, ruling only that if Lincoln did not present Kaye-Kibbey for deposition or produce her at the hearing, Lincoln could no longer use Kaye-Kibbey's Affidavit in the NASD Proceeding.* Fossi Decl., ¶ 7 & Ex. 4.

Ellis Opp at 16 (emphasis added). The court finds that Ellis's characterization of the NASD panel's motivation or rationale for its ruling, is mere speculation. The court makes no finding as to the motivation or reasoning underlying the NASD panel's ruling. In other words, the court makes no finding as to whether the NASD panel believed that it (or a Michigan state court) had the authority to issue a *subpoena ad testificandum* that was enforceable against an individual who was physically outside the State of Michigan.

In any event, the court notes that although the Oakland County Circuit Court could not directly enforce its *subpoena ad testificandum* against Kaye if Kaye remained in Florida, the subpoena was in fact served on Kaye while she was in Michigan.

The NASD arbitration was not, of course, a criminal proceeding. If it were, the Oakland County Circuit Court might have been able to compel Kaye's attendance at the NASD hearing even if she remained in Florida and did not voluntarily travel to Michigan. "[U]nder M.C.L. § 767.91 *et seq.*, a Michigan court may issue a certificate stating the facts and anticipated number of days of litigation, and may also recommend that the witness be taken into custody [by the authorities in the other State] and delivered to the Michigan court." *People v. Nicoll*, 2000 WL 33421273, *2 (Mich. App. May 9, 2000) (citing MICH. COMP. LAWS 767.939(1) and MSA 28.1023(193)(1)). There does not appear to be any comparable provision in Michigan statutory law for compelling someone outside Michigan to attend and testify at a *civil* proceeding in Michigan.

and 29; Kaye Aff. ¶ 13 and Ex. E (Nov. 14, 2006 subpoena ad testificandum; Nov. 15, 2006 signed acknowledgement of receipt of same by Kaye; and Nov 14, 2006 order granting ex parte petition for said subpoena). The parties agree that Kaye was not called to testify at the November 2006 hearing.

According to Ellis, Kaye appeared voluntarily again at the second evidentiary hearing, in April 2007. *See* 2ⁿᵈ Am. Comp. ¶ 30. This time, Lincoln called Kaye to testify, and she underwent direct examination, cross-examination, and re-direct examination on April 19 and 20, 2007, where she allegedly "repeated and amplified the disparaging statements" found in her affidavit. *See* 2ⁿᵈ Am. Comp. ¶¶ 30-31; Fossi Dec ¶¶ 10 & 11 and Exs 7 & 8. Specifically, Kaye testified, *inter alia*, "about the formation of Summit and how Ellis used Summit to transfer customers from Lincoln to Raymond James." Kaye's MTD at 3.

In June 2007, the NASD arbitration panel issued its decision. The panel dismissed with prejudice all of Lincoln's claims against Ellis. *See* Fossi Dec ¶ 19 & Ex 16. The panel found, however, that at the time Lincoln made its "U4" and "U5" filings, Lincoln had had a reasonable basis – "presumably, the accusations of Kaye-Kibbey", writes Ellis, *see* Ellis Opp at 9 – to believe that Ellis had committed fraud and "selling away." *See* Fossi Dec ¶ 19 & Ex 16. The panel concluded that based on the evidence produced at the hearings, Lincoln had not proved selling away or fraud, and therefore stated that Lincoln's statements in the U-4 and U-5 filings "are now defamatory and must be expunged." *Id.*

Kaye contends that her testimony at the April 2007 hearing was made pursuant to the *subpoena ad testificandum* that had been issued by the Michigan state court in November 2006. Kaye Aff. ¶ 15. Ellis responds that the Michigan state court had no authority to issue a subpoena requiring Kaye to testify in an NASD arbitration proceeding. *See* Ellis Opp.

-13-

Ellis complains that he incurred over $350,000 in attorney fees and other costs to defend against Lincoln's accusations, which were based on and supported by Kaye's disparaging comments. 2nd Am. Comp. ¶ 32.[7]

## PROCEDURAL HISTORY

Ellis filed the original complaint in September 2007.  In December 2007, due to several extensions of time, Kaye moved to dismiss or for summary judgment.  With Kaye's consent, Ellis filed an amended complaint in April 2008, which caused the court to deny as moot the motion to dismiss the original complaint.  In May 2008, Kaye moved to dismiss the amended complaint or for summary judgment.  In June 2008, Ellis filed an opposition brief and Kaye filed a reply brief.

The court *sua sponte* examined whether it had jurisdiction, concluding that it appeared to lack federal-question jurisdiction and that Ellis failed to allege sufficient facts to support diversity jurisdiction.  Namely, Ellis's first amended complaint alleged the *residency* of the parties, but made no assertion about their respective domiciles, nor alleged any facts to support a finding on domicile. Accordingly, by order issued July 2, 2008, the court dismissed the complaint without prejudice, denied without prejudice as moot the motion to dismiss or for summary judgment on the first amended complaint, and authorized Ellis to file a second amended complaint that alleges sufficient facts to support a determination that diversity jurisdiction exists.  On July 8, 2008, Ellis filed a

---

[7]

Kaye states that the arbitration ended with a result that was "arguably favorable" to Ellis. *See* MTD at 1.

It is undisputed that Ellis has sued Lincoln and their attorneys in the Circuit Court of Kent County, Michigan, for malicious prosecution, abuse of process, and intentional infliction of emotional distress.  *See* Kaye's MTD at 1 (citing *Ellis v. Dykema Gossett PLLC et al.*, No. 07-10348-NO (Mich. Cir. Ct. Kent Cty.)).

-14-

second amended complaint.  The second amended complaint cures the jurisdictional deficiency by alleging that Ellis is physically present in Michigan, has his fixed and permanent home here, and intends to make Michigan his home indefinitely.  *See* 2d Am. Comp. ¶ 2.  The second amended complaint makes the same allegations with respect to Kaye and the State of Florida.  *See* 2d Am. Comp. ¶ 2.  Kaye has not moved to dismiss for lack of diversity jurisdiction or otherwise challenged Ellis's citizenship allegations.  The second amended complaint demands a jury trial and seeks actual and consequential damages occasioned by Kaye's alleged breach of the Release Agreement's non-disparagement clause.  *See* 2nd Am. Comp., Sections V and VI (Prayer for Relief and Jury Demand).

On July 18, 2008, Kaye moved to dismiss the second amended complaint or for summary judgment.  Ellis filed an opposition brief on July 24, 2008, Kaye filed a reply brief on August 7, 2008, and Ellis did not seek leave to file a sur-reply.

## LEGAL STANDARD:  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

This court assesses a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted  under the same standard as a Rule 12(c) motion for judgment on the pleadings. *Zeigler v. Mieskiewicz*, 2008 WL 650335, *2 (S.D. Ohio Mar. 5, 2008) (citing *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007)).  Such motions turn on legal issues, not an assessment of the evidence. *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*"); *see also Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.").  A Rule 12(c) motion is simply one permissible avenue for contending that the complaint should be dismissed because it fails to state a claim on which relief

can be granted.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 507 (2006) ("a defense of failure to state a claim upon which can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at the trial . . . .") (quoting FED. R. CIV. P. 12(h)(6)).

Such motions "presume as a legal matter the lack of any need for an evidentiary hearing . . . ."  *US v. Raddatz*, 447 U.S. 667, 693-94 (1980).  Indeed, the court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *Tech Rec*, 186 F. App'x at 640 n.5 (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) ("*PONI*")); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)).  But the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions.  *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable.  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007) (en banc) (Sutton, J., joined by Griffin et al.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. –, –, 127 S.Ct. 1955, 1974 (2007)).  "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted).[8]  There must be either direct of

---

[8]

Until 2007, our Circuit followed the standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which directed courts to grant a 12(b)(6) motion "when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Taylor v. Sampson*, 2008 WL 2923435, *2 n.3 (W.D. Mich. July 25, 2008) (Maloney, J.).

inferential allegations regarding all the material elements of each claim. *League of Latin American Citizens v. Bredesen*, 500 F.2d 523, 527 (6th Cir. 2007) (McKeague, J.) (citing *Twombley*, 550 U.S. at –, 127 S.Ct. at 1969).

Our Circuit cautions that district courts should not overstate the hurdle that *Twombley* establishes for plaintiffs to survive a 12(b)(6) (or12(c)) motion

> In *Erickson v. Pardus*, 550 U.S. –, 127 S.Ct. 2197 . . . (2007), decided two weeks after *Twombley*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombley*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (citing *Twombley*, 127 S.Ct. at 1965). We read the *Twombley* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (Griffin, J.) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008) (footnote omitted)) (other internal quotation marks and alterations omitted).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits. *LaFace Records, LLC v. Does 1-5*, 2008 WL 513508, *3 (W.D. Mich. Feb. 22, 2008) (Maloney, J.) (citing *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)).

---

In *Twombley* (2007), the Supreme Court "retired the 'no set of facts' formulation of the Rule 12(b)(6) standard and dismissed an antitrust-conspiracy complaint because it did not contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6th Cir. 2007) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974). "In some cases, *Twombley* may make it easier . . . to grant 12(b)(6) than the *Conley* standard." *Taylor*, 2008 WL 2923435 at *2 n.3.

## LEGAL STANDARD:  SUMMARY JUDGMENT

Summary judgment is proper if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Appalachian Railcar Servs., Inc. v. Consumers Energy Co.*, – F. Supp.2d –, 2008 WL 828112, *13 (W.D. Mich. Mar. 25, 2008) (Maloney, J.) ("ARS") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) (Griffin, J.) (quoting FED. R. CIV. P. 56(c))).  *Accord Brown v. Brown*, 739 N.W.2d 313, 316 (Mich. 2007).

The movant  has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  However, the movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, the movant's initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . ."  *Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. 2000).

Once the movant has met its burden, the non-movant must present "significant probative evidence" to demonstrate that there is more than "some metaphysical doubt as to the material facts." *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*,  266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)).  The non-movant may not rest on the mere allegations of his pleadings. *Wilson*, 112 F. Supp.2d at 654 (citing FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476,

479 (6th Cir. 1995)).[9]  Moreover, the mere existence of an alleged factual dispute between the parties

will not defeat an otherwise properly supported summary judgment motion; there be some genuine

issue of *material* fact.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*13 (citing *Conley*, 266 F. App'x

at 404 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691

(6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert.*

*denied*, – U.S. –, 128 S.Ct. 1334 (2008),[10] and view the evidence in the light most favorable to the

non-movant, giving it the benefit of all reasonable inferences.  *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d

587, 592 (6th Cir. 2007) (Griffin, J.).  But the court considers its evidence only to the extent that it

would be admissible at trial.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*13 (citing *Healing Place*,

744 N.W.2d at 177 (citing Mich. Ct. R. 2.116(G)(6) and *Veenstra v. Washtenaw Country Club*, 645

N.W.2d 643, 648 (Mich. 2002))).

Ultimately, "[e]ntry of summary judgment is appropriate 'against a party who fails to make

a showing sufficient to establish the existence of an element to that party's case, and on which that

party w[ould] bear the burden of proof at trial.'"  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*13

(citing *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477

---

9

*Accord Healing Place at No. Oakland Med. Ctr. v. Allstate Ins. Co.*, 744 N.W.2d 174, 177 (Mich. App. 2007) ("When the burden of proof at trial would rest on the nonmoving party, the nonmovant may not rest on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial.") (citing *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 317 (Mich. 1996)).

10

*Accord Fall v. Loudon*, 2008 WL 375989, \*6 (Mich. App. Feb. 12, 2008) (citing *Dolan v. Continental Airlines/Continental Express*, 563 N.W.2d 23, 26 (Mich. 1997)).

U.S. at 322)).[11]  As Chief Judge Bell has characterized the post-trilogy summary-judgment standard, "[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial." *Wilson*, 112 F. Supp.2d at 654.

## A Federal Court's Application of State Law

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6ᵗʰ Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)).  If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts:  "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's

---

11

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ."  *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7ᵗʰ Cir. 1988). *Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11ᵗʰ Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims.");

*Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10ᵗʰ Cir. 1992);

*Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence") (citations omitted).

intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)). *See also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . .").

In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605.

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, \*14 (W.D. Mich. Mar. 25, 2008) (Maloney, J.) ("*ARS*") (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this

court. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued.. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." . *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")). Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it. *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15; *see, e.g., Michigan Protection & Advocacy Servs. v. Michigan DOC*, – F.Supp.2d –, –, 2008 WL _____, *___ (W.D. Mich. Oct. 3, 2008) (Maloney, C.J.) (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

## DISCUSSION

### Alleged Revocation of First Release Agreement

Whether Kaye effectively revoked the August 27, 2003 release agreement by her alleged letter of the same date is a question of fact. *See Ford Motor Credit Co. v. Odom*, 2007 WL 2214444, *5 (Mich. App. Aug. 2, 2007) ("we find that there are genuine issues of material fact regarding whether the RISC was properly revoked . . . ."), *app. denied*, 743 N.W.2d 912 (Mich. 2008); *cf. Metcalf v. Langer*, 1997 WL 33344076, *3 (Mich. App. Oct. 21, 1997) ("[W]e conclude that genuine issues of material fact existed with regard to whether defendants had revoked their counteroffer . . . .").

This is the quintessential "he said, she said" dispute which the court cannot take out of the province of the factfinder. *See Lane v. Magnum Corp.*, 2008 WL 2066587, *8 (Mich. App. May 15, 2008) (p.c.) (P.J. Kelly, Owens, Schuette) ("This action presented a classic case of 'he said, he said', which revolved around a crucial question of fact – whether an oral agreement existed for salary for life. * * * As such, the trial court was not at liberty to step in and render a directed verdict."). Ellis alleges that Kaye's purported revocation letter is a back-dated fabrication; he states that he never received a hand-delivered copy and his lawyer does not recall receiving a fax copy. Kaye simply responds that she in fact hand-delivered the revocation letter to Ellis and faxed it to his attorney, so the issue is largely one of credibility. *See Ojemudia v. Rite Aid Servs., LLC*, 540 F. Supp.2d 855, 868 (E.D. Mich. 2008) ("[T]his case presents a classic he said/she said scenario. The issue, therefore, is one of credibility, and assessing credibility is a matter for a jury; a court cannot make credibility determinations on summary judgment.") (citing *Anderson*, 477 U.S. at 255). The court also notes that although Kaye alleges that she faxed her revocation letter to Ellis's attorney, she has

not filed a copy of a fax confirmation sheet that is customarily generated when one sends a facsimile transmission. A reasonable factfinder could infer from the absence of such documentary evidence that Kaye did not in fact fax the revocation letter to Ellis's attorney on August 27, 2003.[12] In turn, if that finding caused the jury to consider Kaye generally not worthy of credence, the jury could find that Kaye did not deliver a revocation letter to Ellis or his attorney on any other day, either.

Next, in support, Kaye places much weight on the fact that Ellis provided her with an IRS

---

[12]

*Cf. Crain v. Pinnacle Fin. Group of Minnesota, Inc.*, 2007 WL 3408540, *4 (E.D. Mich. Nov. 14, 2007), where the plaintiff claimed that defendant violated a statute by failing to stop its debt-collection efforts after plaintiff sent a letter asking defendant to stop contact and validate the debt. Plaintiff apparently alleged that he faxed the letter to defendant on April 24, 2007, but the defendant stated that it did not receive any such letter until May 15, 2007. *Id.* The court wrote,

> Defendant's record indicated that on April 25, 2007 '[Plaintiff] claims faxed something to us yesterday.' Even viewed in the light most favorable to Plaintiff, this notation fails to suggest that Defendant received anything. *The fax confirmation page is accompanied by no further information or sworn statement connecting any specific communication to the alleged facsimile transmission.* And no date appears on the certified mail form that Plaintiff submits. Under the circumstances the court can only conclude that Defendant first received Plaintiff's cease demand no earlier than May 14, 2007.

*Id.* at *4 n.2 (emphasis added). *Cf. also Barrett v. Detroit Heading, LLC*, 2006 WL 1662553, *6 (E.D. Mich. June 8, 2006), where one issue was whether plaintiff had provided the defendant employer with notice of an FMLA "event" on November 1, 2004, when he was absent from work. Denying cross-motions for summary judgment on the FMLA claim, the court wrote:

> [T]he only information in the record that plaintiff or his wife was instructed not to go into work on November 1, 2004 comes from the testimony of Rose Barrett. There is no record in Dr. Maribao's office file [for] plaintiff regarding any call from Rose Barrett or Plaintiff (or any notation regarding November 1, 2004 whatsoever). Further, neither Dr. Maribao nor his office workers remember any call from Plaintiff or Rose Barrett that day. Finally, *Defendant and Hampton have testified that they never saw the note from Dr. Maribao's office on November 2, 2004, and no fax confirmation sheet is available.*

*Id.* at *6 (emphasis added).

Form 1099 to report his corporation's forgiveness of a loan that it had made to her. The purported August 28, 2003 release agreement states that it revokes the August 27, 2003 agreement ("Marilyn & Rod agree all previous signed agreements are void . . . .") and provides that "Lucasse, Ellis forgives the loan of approx. 13k, But [sic] Rod will give Marilyn 1099 for it." Kaye reasons that because Ellis did in fact give her a Form 1099 to reflect forgiveness-of-indebtedness income, he must have done so because the August 28, 2003 required it. The court agrees that a reasonable factfinder *could* draw this inference, but it would not be *compelled* to do so.

Accordingly, Kaye cannot secure dismissal or summary judgment on the basis of her alleged revocation of the August 27, 2003 agreement.

## DISCUSSION

### Kaye's Quasi-Judicial / Witness Immunity under Michigan Common Law

Because the court cannot determine as a matter of law whether Kaye revoked the August 27, 2003 release agreement on which Ellis's lone claim is based, it must decide whether Ellis's breach-of-contract claim might be cognizable and have merit if the agreement were still in force when Kaye made the arguably disparaging communications. The court answers that question in the affirmative as to some, but not all, of Kaye's communications.

If Kaye was subject to, and violated, the non-disparagement provision, she has not identified any subpoena or other court order that could immunize her from breach-of-contract liability for many of her arguably disparaging communications. The court breaks Kaye's arguably disparaging communications into four categories.

### The first category consists of communications that Kaye made before Lincoln and Ellis

**were involved in litigation or arbitration, beginning in October 2003.**  Such communications were indisputably *not* made to comply with any valid subpoena or other order, as no court or arbitration panel had yet issued any subpoenas or orders.  As discussed below, the Michigan courts extend a broad immunity for testimony or other communications or disclosures made "in the course of judicial proceedings," at least from the pleadings onward, whether made in court or out of court. *See Maiden v. Rozwood*, 597 N.W.2d 817, 830 (Mich. 1999); *Mundy v. Hoard*, 185 N.W.2d 872, 876 (Mich. 1921) ("This class of privilege is . . . speaking generally, strictly confined to legislative proceedings, judicial proceedings in the established courts of justice, acts of state, and acts done in the exercise of military and naval authority.  In judicial proceedings the protection of the rule extends to judges, counsel, and witnesses."); *see, e.g., Acre v. Starkweather*, 76 N.W. 379 (Mich. 1898) (holding witness was not liable for slander for testimony given in response to questions on cross-examination at a trial).

The quasi-judicial privilege "'extends to every step in the proceeding and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits.'" *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (Mich. App. 2006) (quoting *Couch v. Schultz*, 483 N.W.2d 684 (Mich. App. 1982) and citing *Sanders v. Leeson A/C Corp.*, 108 N.W.2d 761 (Mich. 1961)).  For example, the quasi-judicial privilege immunizes statements made in an attorney's letter in the course of settlement negotiations, *Oesterle*, 725 N.W.2d at 474-75, and "a statement in a prison misconduct report made in connection with a prison disciplinary hearing", *Oesterle*, 725 N.W.2d at 474 (citing C*ouch*, 483 N.W.2d 684).

But Kaye made this first category of communications even before any pleadings were filed in a court or with an NASD arbitration panel.  The Michigan Supreme Court rejected application of

the quasi-judicial privilege at a similar juncture in *Timmis v. Bennett*, 89 N.W.2d 748 (Mich. 1958).

In *Timmis*, the allegedly libelous statements were made in a letter written and distributed by an

attorney before any complaint was filed on behalf of his client involving the subject matter of the

letter.  As the Michigan Court of Appeals has summarized the *Timmis* decision,

> While the letter was arguably in furtherance of the client's interest, our Supreme
> Court reasoned that the letter was "not a part of any case in court, or of any other
> judicial proceeding," that "[t]he fact that such a case was in contemplation does not
> alter the situation in this respect,"' and that the defendant was thus not afforded
> absolute immunity under the judicial proceedings privilege.

*Oesterle*, 725 N.W.2d at 475 (quoting *Timmis*, 89 N.W.2d at 753).

Nor can it be said that Kaye's pre-proceedings communications, although made before any

lawsuit or arbitration was initiated, were required by some legal authority other than a subpoena or

order of a tribunal – such as a statute or regulation.  Nor can it be said that Kaye's pre-proceedings

communications were a necessary predicate for testimony that was later legally required in a court

or other tribunal's proceedings.   These two features distinguish Kaye's pre-proceedings

communications from those of the defendant medical examiner in *Maiden*, 597 N.W.2d 817.  In that

case, Justice Corrigan wrote as follows for the majority:

> Defendant Chung consulted with the prosecutor and later testified against plaintiff
> as the state's factual and expert witness at plaintiff's preliminary examination.  * *
> *
> * * *
> [W]itnesses who testify during the course of judicial proceedings enjoy quasi-judicial
> immunity.   This immunity is available to those serving in a quasi-judicial
> adjudicative capacity as well as "those persons other than judges without whom the
> judicial process could not function."  14 West Group's Michigan Practice, Torts, §
> 9:393, p.9-131.  Witnesses who are an integral part of the judicial process are
> "wholly immune from liability for the consequences of their testimony or related
> evaluations."  *Id.* § 9:394, pp. 9-131 to 9-132, citing *Martin v. Children's Aid
> Society*, 215 Mich. App. 88, 96, 544 N.W.2d 651 (1996).

> Statements during the course of judicial proceedings are absolutely privileged,

> provided they are relevant, material, or pertinent to the issue being tried. *See Martin v. Children's Aid Society*, *supra*; *Rouch v. Enquirer & News*, 427 Mich. 157, 164, 398 N.W.2d 245 (1986); *Meyer v. Hubbell*, 117 Mich. App. 699, 790, 324 N.W.2d 139 (1982); *Sanders v. Leeson Air Conditioning Corp.*, 362 Mich. 692, 695, 108 N.W.2d 761 (1961).  Falsity or malice on the part of the witness does not abrogate the privilege.  *Sanders*, *supra*.  The privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation.  *Id.*
>
> * * *
>
> We reject as factually inaccurate plaintiff's claim that witness immunity is unavailable here because the 'impact' of defendant's opinion 'was not initiated and did not occur in any judicial proceeding . . . .'  The autopsy, investigating the circumstances regarding Robin Reno's death, was performed under statutory mandate and was a necessary predicate to defendant's statutorily compelled testimony.

*Id.* at 830 (emphasis added, footnote omitted, paragraph break added).  The court holds that Kaye has not shown that the Michigan Supreme Court would extend quasi-judicial / witness immunity to this first category of arguably-disparaging communications.

**The second category consists of "communications" made in the form of documents that Kaye produced to Lincoln in order to comply with Judge Enslen's subpoena in Lincoln's federal lawsuit against Ellis.**  The court holds that, as a matter of law, this second set of communications may not lead to the imposition of breach-of-contract liability on Kaye, because of the paramount importance of the public policy favoring obedience to valid subpoenas.  A subpoena, after all, is nothing less than a summons from the court,[13] and the courts' authority cannot stand if private parties are permitted to contractually require others, in effect, not to comply with valid subpoenas.

---

[13]

*Accord Pro v. Donatucci*, 81 F.3d 1283, 1300 (3d Cir. 1996) (Roth, J., dissenting on other grounds) (stating, "[A] subpoena . . . by definition is a summons of the court." and noting that some states have extended their public-policy exceptions to at-will employment to prohibit termination for compliance with a subpoena).

It does not appear that the Michigan courts have addressed whether testimony given (or information produced) in compliance with a valid subpoena can give rise to civil liability under a private non-disclosure or non-disparagement contract.  But the paramount importance that Michigan places on rendering testimony in its courts is evinced by Michigan's longstanding rule that "[s]tatements made by judges, attorneys, and *witnesses during the course of judicial proceedings are absolutely privileged if they are relevant, material, or pertinent to the issue being tried.*" *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (Mich. App. 2006) (emphasis added) (citing *Mundy v. Hoard*, 185 N.W. 872, 876 (Mich. 1921)); *see also Couch v. Schulz*, 483 N.W.2d 684, 686 (Mich. App. 1992) (citing, *inter alia*, *Rouch v. Enquirer & News*, 398 N.W.2d 245 (Mich. 1986) and *Sanders v. Leeson A/C Corp.*, 108 N.W.2d 761 (Mich. 1961)).

For this purpose, "judicial proceedings" are broadly defined to include "any hearing before a tribunal or administrative board that performs a judicial function."  *Oesterle*, 725 N.W.2d at 474.[14] The privilege extends to every step in the proceedings and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits.  *Oesterle*, 725 N.W.2d at 474.[15]

---

[14]

*Cf. Wiskotoni v. Michigan Nat'l Bank - West*, 716 F.2d 378, 381-83 (6th Cir. 1983), where our Circuit upheld a verdict finding that a bank violated Michigan public policy by terminating its branch manager because he complied with a subpoena to testify before a grand jury.

[15]

*See, e.g., Hoff v. Spoelstra*, 2008 WL 2668298, *13 (Mich. App. July 8, 2008) (p.c.) (P.J. Whitbeck, Jansen, Davis) (applying the absolute litigation privilege to shield attorneys from claims for civil extortion and intentional infliction of emotional distress arising out of attorneys' allegedly leaking plaintiff's private e-mails to the local press during litigation);

*Radulovich v. Tenaglia*, 2005 WL 1335144 (Mich. App. June 7, 2005) (p.c.) (P.J. Neff, Owens, Fort Hood), *app. den.*, 707 N.W.2d 208 (Mich. 2005);

*Celley v. Stevens*, 2004 WL 134000 (Mich. App. Jan. 27, 2004) (p.c.) (P.J. O'Connell, Jansen, Wilder), *app. den.*, 688 N.W.2d 78 (Mich. 2004);

The judicial-proceedings immunity "should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation." *Couch*, 483 N.W.2d at 686 (citing *Sanders v. Leeson A/C Corp.*, 108 N.W.2d 761, 762 (Mich. 1961) and *Meyer v. Hubbell*, 324 N.W.2d 139, 143 (Mich. App. 1982)).  Crucially, the Michigan Supreme Court has emphasized that so long as the statements are relevant, pertinent or material to the matter at issue in the proceedings, "'their falsity or the malice of their author is not open to inquiry.  They are then absolutely privileged.'"  *Sanders*, 108 N.W.2d at 762 (unanimous decision) (quoting *Hartung v. Shaw*, 89 N.W. 701, 701 (Mich. 1902)).

Absent any Michigan authority tending to the contrary, this court holds that the Michigan Supreme Court would likely follow the same reasoning to preclude breach-of-contract liability one who gives testimony or produces information in a judicial proceeding – at least to the extent that such action was necessary to comply with a subpoena or other order (and perhaps even if the

---

*Morris v. Arbanas*, 2002 WL 31424824 (Mich. App. Oct. 29, 2002) (p.c.) (P.J. Whitbeck, O'Connell, Meter), *app. den.*, 669 N.W.2d 813 (Mich. 2003);

*Bielaska v. Orley*, 2001 WL 755921 (Mich. App. Feb. 9, 2001) (p.c.) (P.J. Smolenski, Holbrook, Gage);

*Otero v. Warnick*, 614 N.W.2d 177, 182 (Mich. App. 2000);

*Recchia v. Bd. of Regents of the University*, 2000 WL 33533996 (Mich. App. Feb. 25, 2000) (p.c.) (P.J. O'Connell, Murphy, Jansen), *app. den.*, 623 N.W.2d 245 (Mich. 2001);

*Luther v. Luther*, 1999 WL 33326766 (Mich. App. Dec. 28, 1999) (p.c.) (P.J. Saad, McDonald, Gage);

*Reno v. Chung*, 559 N.W.2d 308 (Mich. App. 1996), *aff'd sub nom. Maiden v. Rozwood*, 597 N.W.2d 817 (Mich.), *reh'g den.*, 602 N.W.2d 576 (Mich. 1999);

*Pagoto v. Hancock*, 200 N.W.2d 777 (Mich. App. 1972).

communication was made in court in a judicial proceeding but not required by any subpoena or court order).

Ellis has not alleged, let alone demonstrated, that Kaye provided any information or gave any testimony in response to Judge Enslen's April 2004 subpoena that was not "relevant, pertinent or material" to the matter at issue in the proceeding.  *See Hartung v. Shaw*, 89 N.W. 701, 702 (Mich. 1902) ("Where a party shows in his declaration a publication presumptively privileged, it is his duty, in order to recover, to prove that the words spoken were not pertinent or relevant, and that they were not spoken *bona fide*.  If it be necessary to prove this, it is equally necessary to allege it.").

Accordingly, the Michigan Court would extend an absolute privilege to Kaye for such information and testimony, and she may not be held liable in contract for any materials she produced that were covered by the terms of Judge Enslen's April 2004 subpoena *duces tecum*.[16]

---

[16]

Ellis repeatedly cites decisions from other jurisdictions apparently holding, *inter alia*, that a non-disparagement agreement cannot be enforced to the extent it impairs compliance with a valid subpoena or other obligation to participate in a judicial proceeding.  *See*:

Ellis MTD at 6-7 (citing *GE v. Sargent & Lundy*, 916 F.2d 1119, 1126-27 (6th Cir. 1990) (Kentucky law));

Ellis MTD at 7 (citing *Camp v. Eichelkraut*, 539 S.E.2d 588, 597 (Ga. App. 2000) (Georgia law) and *Cooper Tire & Rubber Co. v. Farese*, 432 F.3d 446, 457 (5th Cir. 2005) (Mississippi law));

Ellis MTD at 9 (citing *Traveler's Indem. Co. v. Hill*, 388 So.2d 648, 650 (Fla. App. 1980));

Ellis MTD at 9-10 (citing *Cooper Tire*, 432 F.2d 446 (Mississippi law));

Ellis MTD at 10 (citing *Camp*, 539 S.E.2d at 597-98 (Georgia law) and *Cooper Tire*, 423 F.3d at 457 (Mississippi law));

Ellis Reply at 5-6 (again relying on *Camp*, 539 S.E.2d at 597-98 (applying Georgia law) and *Cooper Tire*, 423 F.3d at 457 (applying Mississippi law));

Ellis Reply at 7-10 (discussing *Smelkinson Sysco v. Harrell*, 875 A.2d 188 (Md. Spec. App.

-32-

**The third arguably-disparaging communication was the affidavit that Kaye signed on April 7, 2004, which Lincoln later proffered in the later-filed federal lawsuit and the later-filed NASD arbitration proceedings.**  Neither Judge Enslen's *subpoena duces tecum* nor the Michigan state court's subpoena *ad testificandum* could have required Kaye to sign this affidavit, of course, because both subpoenas were issued after she signed it (in late April 2004 and November 2006, respectively).  And Kaye has not alleged that any other order required her to sign the affidavit, either directly or indirectly.  Thus, Kaye was not faced with a choice between obeying the contractual non-disparagement clause or the subpoena or order of any court or tribunal, and the affidavit is not protected by absolute quasi-judicial immunity.

**The fourth category of arguably-disparaging communications was the live testimony**

───────────────────

2005)).

        *See also* Kaye's Opp at 13-19 (responding to Ellis's reliance on non-Michigan decisions).

This shows diligent research by plaintiff's counsel, and in other circumstances it might be appropriate to call the court's attention to such case law.

        However, because this court is applying Michigan state law, it is obliged to predict how the Michigan Supreme Court would rule.  In doing so, this court cannot consider a decision outside the Michigan state-court system – even as persuasive authority – "unless adopted or substantively commented on by Michigan appellate courts." *ARS*, – F. Supp.2d at – n.27, 2008 WL 828112 at *39 n.27 (Maloney, J.) (citing *US v. Harvey*, 1993 WL 152184, *4 (5th Cir. Apr. 26, 1993) ("The cases which Harvey relies on, which involve . . . the laws of other States, are not relevant . . . .  Under Texas law, the only provision . . . ."). Neither party has identified Michigan decisions adopting or substantively commenting on any of the non-Michigan decisions cited.

        "As our Circuit has explained, 'cases cited from other jurisdictions are irrelevant, because we have no authority in a diversity case such as this to apply anything other than Michigan law, or to alter that law to apply to the facts of the case before us.'" *ARS*, – F. Supp.2d at – n.27, 2008 WL 828112 at *39 n.27 (quoting *Philips v. Cabot Med.*, 201 F.3d 441, 1999 WL 1204796, *2 (6th Cir. Dec. 7, 1999) (p.c.) (Boggs, Daughtrey, D.J. McKinley).  Accordingly, the court disregards all the non-Michigan decisions cited or discussed by either party.

**that Kaye tendered at the April 2007 hearing before the arbitration panel in the Lincoln-Ellis**

**NASD proceeding.  These communications present a more difficult question.**  Kaye contends

that her testimony was required by the Michigan state court's *subpoena ad testificandum*, and

therefore that she cannot be held liable for breaching the nondisparagement agreement through that

testimony.

Kaye contends, and Ellis concedes[17], that the Michigan court's subpoena

could have been used to force Ms. Kaye-Kibbey to provide testimony under the
Uniform Foreign Depositions Act.  *See* MDL 600.1582; West's F.S.A. § 92.251.
According to the UFDA, "when a Florida [or Michigan] litigant needs testimony of
[an out of state witness], the first step in the proceedings is to secure the appointment
of a commissioner by the [litigant's] court.  Application is then made [to the foreign
court] for the process necessary to secure the attendance of the witness." *Travelers'
Indem. Co. v. Hill*, 388 So.2d 648, 650 (Fla. Ct. App. 1980).  Thus, the Michigan
subpoena that Lincoln issued against Ms. Kaye-Kibbey could have been used to
require her cooperation.

Def Kaye's Reply at 8-9.  Ellis emphasizes, "That, however, never happened.  Lincoln made no

attempt to depose Kaye-Kibbey . . . .  While a non-disparagement agreement may not prevent a

witness from testifying in response to a *valid* subpoena, it was a breach of the agreement to travel

voluntarily several thousand miles [sic][18] to offer up false testimony about Ellis."  Ellis at 17 & 18.

Kaye responds, "Ms. Kaye-Kibbey should not be exposed to liability because she cooperated instead

of forcing Lincoln to follow through with this procedure."  Def Kaye's Reply at 19.

Kaye's point is well-taken, as far as it goes.  Generally, Ellis has not shown that the Michigan

---

[17]*See* Ellis Opp at 17 ("There is indeed a procedure for Michigan litigants to request,
through the Michigan courts and then the Florida courts, permission to take the deposition of a
Florida resident in Florida.  *See* FLA. STAT. ANN. § 92.251 (2008).").

[18]

The approximate distance from Troy in Oakland County, Michigan to Miami, Florida, is
1,381 miles, not "several thousand miles", but Ellis's factual exaggeration on this score is not
material to Kaye's motion for summary judgment.

state court's *subpoena ad testificandum* was *ultra vires* or otherwise invalid or intrinsically unenforceable. Absent any suggestion that the Michigan court was acting in the absence of all jurisdiction, its subpoena, like any other court order or judgment, is presumed to be valid and commands obedience. *See Central Nat'l Bank v. Graham*, 76 N.W. 1042, 1043 (Mich. 1898) (referring to "the presumption of the validity of this judgment [of the Wayne County Circuit Court]"); *Ross v. Griffin*, 18 N.W. 534, 537 (Mich. 1884) (against plaintiff's claim that an alimony order of September 13 was void, the Supreme Court remarked "There were proceedings taken, *presuming the order of the thirteenth of September valid . . . .*"). More specifically, the Michigan case law on quasi-judicial witness immunity does not require Kaye to ignore the subpoena *ad testificandum* and then be forced to comply by coming to Michigan – or by submitting to deposition in Florida – in order to be shielded from liability for her testimony pursuant to the subpoena. So Kaye was entitled to absolute quasi-judicial immunity for testimony that she gave at the Michigan NASD arbitration hearing, with the Michigan court's *subpoena ad testificandum* already issued and an imminent Uniform Foreign Depositions Act motion looming if she did not attend.

But again, the Michigan court's 2006 subpoena did not purport to require Kaye to produce any documents or tangible things, submit any affidavit, or make any out-of-court statements; it required her only to testify. Whether the Michigan court *could* have required Kaye to do more than testify is beside the point. The fact is the Michigan court did not require Kaye to submit the affidavit (which, after all, she did way back in April 2004) or do anything more than be present and available to testify if called upon. *Cf. Mero v. U.S. Figure Skating Ass'n*, 2006 WL 163529, *7-8 (E.D. Mich. Jan. 20, 2006) (Steeh, J.) (applying Michigan law) (as part of private athletic organization's disciplinary process, organization sent its members a letter advising that plaintiff skating coach had

been suspended for unethical behavior; court held that absolute quasi-judicial privilege did not apply against defamation claim because, *inter alia*, "USFSA does not argue it owed a legal duty to communicate the results of Mero's suspension to other USFSA members or clubs") (citing *Bacon v. Michigan Cent. R. Co.* 33 N.W. 181 (Mich. 1887)).

For the foregoing reasons, the court will dismiss Ellis's complaint as to the second category of communications (material that Kaye produced after and in compliance with Judge Enslen's April 2004 subpoena duces tecum) and the fourth category (Kaye's testimony at the April 2007 NASD hearing, which was subsequent to the state court's issuance of a *subpoena ad testificandum*).

Ellis's claim survives, however, as to the first category (communications that Kaye made from October 2003 into April 2004 prior to the institution of the federal lawsuit *Lincoln v. Ellis* and the institution of the NASD arbitration proceedings) and the third category (Kaye's April 7, 2004 affidavit, which she prepared and signed prior to the institution of the federal lawsuit and the NASD arbitration proceedings).


## ORDER

Defendant's motion to dismiss the first amended complaint or for summary judgment on the first amended complaint [document # 31] is **DENIED without prejudice as moot.**

Defendant's motion to dismiss the second amended complaint or for summary judgment on the second amended complaint [document # 40] is **GRANTED in part and DENIED in part.**

Plaintiff's claim is **DISMISSED** as to:

—    any communications that defendant made, including but not limited to documents or electronic media or other tangible things that she produced or arranged to have

produced, after the April 2004 issuance of the *subpoena duces tecum* by the Honorable Richard Alan Enslen, Senior United States District Judge, in *Lincoln Nat'l Life Ins. Co. & Lincoln Fin. Advisors Corp. v. Rodney D. Ellis & Ellis Lucasse, Inc.*, Case No. 1:2004-cv-251 (W.D. Mich.), which were covered by the terms of said *subpoena duces tecum*;

— any testimony that the defendant gave at an April 2007 hearing before an arbitration panel in NASD Case No. 06-02347 (at which hearing she was ordered to appear and testify by a *subpoena ad testificandum* issued by the Circuit Court of Oakland County, Michigan).

Plaintiff's claim **SURVIVES** as to all other arguably-disparaging communications allegedly made by the defendant, including but not limited to:

(1)     defendant's oral and written communications with Lincoln employees, agents, or counsel from October 2003 through and including April 12, 2004 and

(2)     defendant's preparation and signing of an affidavit on April 7, 2004.

This is <u>not</u> a final and appealable order, because it does not dispose of all issues as to all parties. *See, e.g., Johnson v. UPS*, 117 F. App'x 444, 447 (6th Cir. 2004) ("[T]he appeal of Plaintiff Johnson was dismissed by this Court for lack of appellate jurisdiction, on grounds that no ruling had yet been entered terminating all issues in the case as to all litigants and that no appealable order as to Johnson had been issued under FED. R. CIV. P. 54(b)).[19]

---

[19] Moreover, the court will not entertain a reconsideration motion raising issues or arguments, or introducing evidence, that already were raised (or could have been raised) in these briefs. *See:*

*PolyVision Corp. v. Smart Techs., Inc.*, 2007 WL 2683516, *1 (W.D. Mich. Sept. 7, 2007) (Quist, J.) ("[A] motion for reconsideration may not be used to raise issues that could have been

**IT IS SO ORDERED this 10th day of October 2008.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

raised in the previous motion, or to introduce evidence which could have been proffered during the pendency of a summary judgment motion") (citations to out-of-Circuit decisions omitted);

*IIT Indus., Inc. v. BorgWarner, Inc.*, 2006 WL 2811310, *1 (W.D. Mich. Sept. 28, 2006) (Bell, C.J.) ("Under Local Rule 7.4(a), a motion for reconsideration may not present the same issue ruled upon."), *aff'd in part, rev'd in part on other grounds*, 506 F.3d 452 (6th Cir. 2007), *reh'g & reh'g en banc denied* (6th Cir. 2008);

*Martin v. A.O. Smith Corp.*, 931 F. Supp. 543, 550 (W.D. Mich. 1996) (McKeague, J.).

A motion for reconsideration is "not an opportunity to reargue the case", *Aero-Motive Co. v. Becker*, 2001 WL 1699194, *1 (W.D. Mich. Dec. 6, 2001) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)), even if the would-be movant is dissatisfied with the depth of treatment accorded an issue in the opinion or wishes to introduce additional authority in support of an argument already made and rejected.